**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Gopalakrishna Pillai Ajeesh Kumar**
**Kammarayil**
Kammarayil House, Pennukkara P.O.
Alappuzha District
Kerala, <u>INDIA</u>  689121

**Mohammed Azad Shabbir**
V and P.O. Dadheru Kalan
PS Charthawal, District Muzaffarnagar
Uttar Pradesh, <u>INDIA</u>
               *Plaintiffs*,
vs.

**Sterling Operations, Inc.**
229 Old Highway 95
Lenoir City, TN  37771

**Matt Kaye**
c/o 229 Old Highway 95
Lenoir City, TN  37771

**Lisa Jacobson**
844 Brochardt Blvd.
Concord, TN 37934-0932

**Erik Quist**
12130 Butternut Circle
Knoxville, TN

**Henry Mincke**
2463 Blue Meadow Lane
Knoxville, TN 37932-1458

**Les Lunceford**
10124 Highgate Circle
Knoxville, TN

**Curtis Guilbeaux**
2348 Howard Ave
Medford, OR 97501-1319

**Kevin Beamish**
5068 Preserve Blvd.
Antioch, TN 37013-2464

**John Jordan**
4553 Catalina Court
Murfreesboro, TN 37128-2757

Case No. _____

**Filed *In Camera* and**

# <u>UNDER SEAL</u>

**Pursuant To**
**U.S. False Claims**
**Act, 31 U.S.C. § 3730(B)(2)**

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**
**JURY DEMAND**

Punitive Damages
Attorney Fees and
Jury Trial Requested

**Mark Anderson**
84 Harrison Hill Road, rd1
Aokautere
Palmers ton North
NEW ZEALAND

**James Osterloh**
614 Myrtle Street
Monett, MO 65708-2413

**David Cook**
Kingston, TN

**Loren Hughes**
6205 Highway 209 North
Ripley, TN 38063-7507

**Wayne Bryce**
8802 Gatwick Drive
Knoxville, TN 37922-6024

**George Perkins**
598 Old Middlesboro Hwy
La Follette, TN 37766-5100

**Susan Davis**
602 North C Street
Lenoir City,  TN

**Matt Knetchel**
3414 Peachtree Rd NE
Atlanta, GA 30326-1153

**James Pearson**
81 Herrington Hill Road
Greenwich, NY 12834

**Thomas Dwyer**
112 Matthew Lane
Nashville, TN 37215-1543
                    *Defendants*.

## COMPLAINT
(False Claims Act, 31 U.S.C. § 3729 *et seq.*)

1.     The United States of America ("U.S."), by and through Relator Gopalakrishna Pillai Ajeesh Kumar Kammarayil ("Relator Kumar") and Relator Mohammed Azad Shabbir ("Relator Shabbir"), nationals of India now living in the State of Kuwait, brings this action under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, against Sterling Operations, Inc. ("Defendant") and Matt Kaye, Lisa Jacobson, Erik Quist, Steve Voland, Henry Mincke, Les Lunceford, Kevin Beamish, John Jordan, Mark Anderson, James Osterloh, David Cook, Loren Hughes, Wayne Bryce, George Perkins, Susan Davis, Matt Knetchel, James Pearson, and Thomas Dwyer ("FCA Conspiracy Defendants).

2.     "Sterling," at the relevant times giving rise to this Initial Disclosure Statement operating as "EOD Technology, Inc.") made false claims to the U.S. in order to obtain unjustified payment from the U.S. on Contract W91B4N-08-D-0012.  In addition, Not only were Relators first-hand witnesses to acts that exposed false claims made by Sterling to the U.S., Relators' investigations uncovered a broad criminal conspiracy to make false claims to, and obtain unjustified payments from the U.S.; engage in an armed invasion; perpetrate an armed robbery and to corrupt foreign public officials.

### PARTIES TO THE ACTION

3.     **Sterling** is a Delaware corporation headquartered and authorized to do business in Tennessee, with its principle place of business located at 2229 Old Highway 95, Lenoir City, Loudoun County, Tennessee, 37771.  Sterling (formerly known as "EODT") served as the prime contractor to USACE on an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract to supply

RLBs to the Bagram Airbase in Afghanistan.  Sterling changed its name from EOD Technology on October 24, 2012.

4.      **Matt Kaye** is the President of Sterling and can be found at c/o 229 Old Highway 95, Lenoir City, TN  37771.  President Kaye approved of Operation Midshipman and remained in constant communication with the Sterling employees who carried it out.  Without Defendant Kaye's consent and approval of Operation Midshipman, the misconduct herein complained of would not have occurred.

5.      **Lisa Jacobson** is the Chief Financial Officer of Sterling who lives at 844 Brochardt Blvd., Concord, TN 37934-0932.  Ms. Jacobson was an active participant in the planning of Operation Midshipman and approved of various Request for Equitable Adjustments that were submitted to the U.S. that were false and misleading as they did not disclose to the U.S. the theft of the RLB modules delivered to the U.S., properly identify the source of damage to the RLB modules that were delivered to the U.S., or properly disclose that the increased costs of contract performance were caused by Sterling's own misconduct.

6.      **Erik Quist** is Vice President and General Counsel of Sterling and resides at 12130 Butternut Circle, Knoxville, TN.  Mr. Quist was an active and early participant in the planning of Operation Midshipman providing early "legal" approval for the scheme.  Mr. Quist was also approved of false statements that were made to the U.S., false statements that were used to secure unjustified payment on Contract W91B4N-08-D-0012.

7.      **Henry Mincke** is Director of Capture and Proposals at Sterling and resides at 2463 Blue Meadow Lane, Knoxville, TN 37932-1458.  Mr. Mincke was an early participant in the planning of Operation Midshipman and directly supervised the execution of the raid.

8.     **Les Lunceford** is a former employee of Sterling who was principally responsible for planning the raid known as Operation Midshipman.  Defendant Lunceford lives at 10124 Highgate Circle, Knoxville, TN.  For all times relevant to this complaint, Defendant Lunceford was a civilian contractor working with the U.S. military in Afghanistan.  During the time he was in Afghanistan, Defendant was the principal planner and commanding officer of Operation Midshipman.  During the time Defendant Lunceford was in Afghanistan, he communicated regularly with Henry Mincke, and communicated with Matt Kaye, Lisa Jacobson, and Erik Quist regarding the planning of Operation Midshipman, the execution of Operation Midshipman, and the deceptions carried out by Sterling in Afghanistan following the execution of Operation Midshipman.

9.     **Curtis Guilbeaux** is a former employee of Sterling and was one of the early participants in the plan engage in the taking of property known as Operation Midshipman.  Specifically, it was Defendant Guilbeaux who proposed a plan to place MAKS in a position of vulnerability and use that vulnerability to steal, for Sterling's benefit, the investment that MAKS was making in performing as a subcontractor to Sterling.  On information and belief, Mr. Guilbeaux resides at 2348 Howard Avenue, Medford, OR 97501-1319.

10.     **Kevin Beamish** was formerly Vice President for Finance at Sterling.  On information and belief, Mr. Beamish lives at 5068 Preserve Blvd., Antioch, TN 37013-2464.  Mr. Beamish was an early planner of Operation Midshipman having provided financial analysis of the cost to Sterling of performing on Contract W91B4N-08-D-0012 once Sterling had stolen the RLB modules from MAKS.

11.     **John Jordan** was an employee of Sterling who served as Chief of Party for the company in Afghanistan.  As Chief of Party, Defendant Jordan worked closely with Defendant

Lunceford on the planning of Operation Midshipman and in the deceptions perpetrated in Afghanistan following the execution of Operation Midshipman.  It was John Jordan who gave the final order to execute Operation Midshipman.  While in Afghanistan, Defendant Jordan played a significant role in keeping Matt Kaye, Lisa Jacobson, Henry Mincke, and Erik Quist informed of Operation Midshipman.  On information and belief, Defendant Joran lives at 4553 Catalina Court, Murfreesboro, TN 37128-2757.

12.     **Mark ("Andy") Anderson** served in Afghanistan for Sterling as the Project Manager of the RLB program.  Defendant Anderson was one of the principle architects of Operation Midshipman and it was Defendant Anderson who led the armed invasion of the MAKS compound on October 23, 2009.  It was Defendant Anderson who instructed MAKS employees, including Relator Kumar and Relator Shabbir, not to interfere with Sterling's seizure of the RLB modules or they would be shot.  Upon information and belief, Defendant Anderson lives sat 84 Harrison Hill Road, RD1, Aokautere, Palmerston North, New Zealand.

13.     **James Osterloh** served as a construction foreman for Sterling in Afghanistan. Defendant Osterloch was briefed into Operation Midshipman as early as July 12, 2009 and contributed to its implementation.  On information and belief, Defendant Osterloh lives at 614 Myrtle Street, Monett, MO 65708-2413.

14.     **David Cook** was a principle architect of Operation Midshipman.  It was Defendant Cook who obtained approval for Operation Midshipman on or about July 2, 2009, and communicated that approval to Henry Mincke, John Jordan, Les Lunceford, and Mark Anderson. On information and belief, Defendant Cook was the one who proposed Operation Midshipman to Sterling.  It was Defendant Cook who drafted the letter for Erik Quist's signature terminating the Master Subcontract Agreement with MAKS – a fraudulent document as it had been written in

anticipation of executing on Operation Midshipman.  On information and belief, Defendant Cook lives in Kingston, TN.

15.     **Loren Hughes** worked in Afghanistan and was a member of the Operation Midshipman team.  Defendant Hughes both trespassed upon MAKS's property and supervised the loading of the stolen MAKS RLB modules onto trucks at the MAKS compound and the unloading of the trucks at the Sterling compound, "Camp Echo."  On information and belief, Defendant Hughes lives at 6205 Highway 209 North, Ripley, TN 38063-7507.

16.     **Wayne Bryce** worked in Afghanistan as the Deputy Project Manager of the Bagram RLB program.  Defendant Bryce was a member of the Operation Midshipman team.  Defendant Bryce trespassed on MAKS's property on October 23, 2009 and assisted with the theft of the RLB modules.  On information and belief, Defendant Bryce lives at 8802 Gatwick Drive, Knoxville, TN 37922-6024.

17.     **George Perkins** served, in Afghanistan, as the Construction Supervisor for Sterling.  As part of the Operation Midshipman team in Afghanistan, it was Defendant Perkin's job to get Camp Echo up and running so that it could accept the stolen RLB modules that were trucked off the MAKS compound.  On October 8, 2009, Defendant Perkins urged the execution of Operation Midshipman stating, "we will most likely need to execute Midshipman to have any chance to meet our [Period of Performance]."  On information and belief, Defendant Perkins resides at 598 Old Middlesboro Highway, La Follette, TN 37766-5100.

18.     **Susan Davis** worked in Afghanistan for Sterling.  Susan's responsibilities were to be dedicated to making sure that the logistics of Operation Midshipman were adequately arranged.  It was Defendant Davis who kept and maintained the Operation Midshipman file in Afghanistan, and it was Defendant Davis who monitored the repairs to the RLB modules at

Camp Echo.  Defendant Davis was part of the team of Sterling employees who invaded the MAKS compound at 5:30 a.m. on October 23, 2009.  Defendant Davis lives at 602 North C Street, Lenoir City, TN.

19.     **Matt Knetchel** worked as a personal security guard for Sterling in Afghanistan. Defendant Knetchel was part of the Operation Midshipman team and was part of the contingent that invaded the MAKS compound at 5:30 a.m. on October 23, 2009.  Defendant Knetchel was one of the armed security personnel that entered the MAKS compound.  Defendant Knetchel lives at 3414 Peachtree Rd NE, Atlanta, GA 30326-1153.

20.     **James Pearson** worked as a personal security guard for Sterling in Afghanistan. Defendant Pearson was part of the Operation Midshipman team and was part of the contingent that invaded the MAKS compound at 5:30 a.m. on October 23, 2009.  Defendant Pearson was one of the armed security personnel that entered the MAKS compound.  Defendant Pearson lives at 81 Herrington Hill Road, Greenwich, NY 12834.

21.     **Thomas Dwyer** worked for Sterling in Afghanistan as a construction manager. Defendant Dwyer was part of the Operation Midshipman team.  Defendant Dwyer was part of the armed invasion of MAKS's compound on October 23, 2009.  Defendant Dwyer assisted in the removal of the RLB modules from the MAKS compound.  Once the stolen RLB modules were transported to Camp Echo, Defendant Dwyer acted to hide evidence of Sterling's theft by removing the MAKS nameplates from the stolen RLB modules so that they could not be readily identifiable as belonging to MAKS.  On information and belief, Defendant Dwyer lives at 112 Matthew Lane, Nashville, TN 37215-1543.

22.     **Relator Kumar** is a citizen of India with a permanent address of Kammarayil House, Pennukkara P.O., Alappuzha District, Kerala, INDIA 689121.  Relator Kumar is currently working in the State of Kuwait and living at Jleeb Shuwaikh Abbaisa, Kuwait.

23.     **Relator Shabbir** is also a citizen of India with a permanent residence of V and P.O. Dadheru Kalan, PS Charthawal, District Muzaffarnagar , Uttar Pradesh, INDIA.  Relator Shabbir is also working in the State of Kuwait and living at Street No. 133, Block No. 2, Building No. 160, Room No. 25, Jleeb Shuwaikh, Kuwait.

## JURISDICTION AND VENUE

24.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 3730(b).

25.     Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(3) and 3732(a), as Sterling Operations, Inc. conducts a continuous course of business in the District of Columbia including extensive contracting with the Department of Defense offices located at The Pentagon, Room 3B514, Washington, DC 20310-0106.

## SUMMARY OF FALSE CLAIMS

26.     At 5:30 a.m. on October 23, 2009, Sterling staged an armed invasion of the Kabul, Afghanistan compound of the Kuwait-based company MAKS Inc. General Trading & Contracting Co. ("MAKS").

27.     At that time and place, Relator Kumar and Relator Shabbir, employees of MAKS, were sleeping in their living quarters.

28.     After being jolted out of bed by the invasion of assault weapon-wielding Sterling security forces, Relator Kumar and Relator Shabbir watched helplessly as Sterling's security forces rounded up MAKS's personnel, held them at bay with assault rifles, waved more than one

hundred flat-bed trucks into MAKS's compound and stole 90 relocatable building ("RLB")

modules that were the subject of a subcontract between MAKs and Sterling.

29.     For having been personally threatened by the assault-rifle totting Sterling security

personnel, Relator Kumar and Relator Shabbir joined MAKS's October 21, 2010 breach of

contract, trespass, and conversion lawsuit against Sterling in the U.S. District Court for the

Eastern District of Tennessee.

30.     Discovery obtained in the course of the TN Lawsuit revealed that the raid they

experienced had been planned as "Operation Midshipman" by Sterling's senior management at

least as far back as June 2009.

31.     Relator Kumar and Relator Shabbir's first-hand experience with the invasion and

theft perpetrated by Sterling, combined with evidence revealed in discovery regarding claims and

representations made by Sterling to the U.S., provide Relator Kumar and Relator Shabbir with

original source knowledge that Sterling's claims and representations to the U.S. were material

and false.

32.     Sterling's entire contractual relationship with the U.S. was founded on an on-

going pattern of false claims and fraudulent conduct.

33.     The United States Army Corps of Engineers ("USACE") assigned RLB task

orders to Sterling on Sterling's representation that Sterling's bargained-for, anticipated profit

would be based on Sterling purchasing services from such subcontractors MAKS.  However,

from at least as far back as June 2009, Sterling had planned to <u>steal</u> RLB modules from MAKS.

34.     Had Sterling not made false statements to USACE, had Sterling been truthful with

USACE that its plan of performance in delivering RLB modules to the Bagram Airbase included

stealing those RLB modules from a Kuwait-registered company, USACE would have terminated its contract with Sterling and paid no additional money to the company.

35.     Sterling made false claims to USACE in various Requests for Equitable Adjustment ("REAs") submitted to request additional remuneration for the delivery of the RLB modules.

36.     As witnessed by Relator Kumar and Relator Shabbir, when Sterling stole the RLBs from the MAKS compound, it used a mobile crane to snatch and grabbed RLB modules that had not been properly secured for transport.

37.     Sterling dropped the RLB modules onto ill-fitting flatbed trucks from a distance of two to three feet.

38.     The impact and the subsequent jostled transport of the unsecured RLB modules damaged them.

39.     After the stolen RLB modules had been delivered to a newly leased Sterling compound called "Camp Echo," Sterling hired a contractor AIA Holdings Afghanistan to repair the modules prior to delivering them to the Bagram Airbase.

40.     Ultimately, most of the stolen RLB modules could not be repaired and Sterling was forced to purchase fifty-six new RLB modules from a company called Conex.

41.     None of the REAs revealed that Sterling itself had damaged the RLB modules by recklessly stealing them.  Instead, Sterling made false claims to the U.S. that the poor condition of the RLB modules was due to the poor quality of its MAK's workmanship.

42.     Not only did the U.S. rely on Sterling's (false) claims in approving upward equitable adjustments to Sterling's compensation, but the U.S. relied on Sterling's (false) claims to grant equitable adjustments to Sterling's Period of Performance ("POP").  False statements

and false claims regarding the causes of Sterling's POP delays were sent to the U.S., many

blaming Sterling's subcontractors for delays in delivering RLB modules to the Bagram Airbase.

43.     Had Sterling had told the truth to the U.S., it would have disclosed that delays in

delivering the RLB modules were caused by delays in Sterling being able to execute upon

Operation Midshipman.

44.     These delays damaged the U.S. by requiring the U.S. to extend the POP and pay

for alternative shelters for U.S. service men and women.

    **1.**       **USACE Solicits Indefinite Duration Indefinite Quantity Bids for Construction of Relocatable Buildings in Afghanistan.**

45.     On May 15, 2008, USACE broadcast Solicitation W91B4N-08-R-0021 for an

IDIQ contract to supply RLBs in Afghanistan.

46.     RLBs are constructed out of RLB "modules."   A module is a living or working

space that is fabricated from a shipping container.  The shipping container is stripped of its

original flooring and interior, installed with new flooring and walls, wired for electricity,

equipped with plumbing, air conditioning and heating and then combined, "lego-style" with

other RLB modules to make large, multi-story buildings.  RLB module-created buildings are

desirable for overseas military deployments because they can be disassembled and reassembled

on short notice.

47.     IDIQ is a U.S. federal government contracting acronym meaning indefinite

delivery/indefinite quantity. This is a type of contract that provides for an indefinite quantity of

supplies or services during a fixed period of time. The legal origin of IDIQ contracts is the

Federal Acquisition Regulation (FAR) section 16.504(a) (48 C.F.R. 16.504(a).  IDIQ contracts

are most often used for service contracts and Architect-Engineering (A-E) services. Awards are

usually for base years as well as option years. The government places task orders for services against a basic contract for individual requirements.  The government uses an IDIQ contract when it cannot predetermine, above a specified minimum, the precise quantities of supplies or services that it will require during the contract period.  An IDIQ contract helps streamline the contract process and speed service delivery by prequalifying a small group of government contractors who are then permitted to compete against each other for specific task orders within the umbrella IDIQ.  Sterling was one such prequalified company.

48.     By way of Contract W91B4N-08-D-0012, Sterling became prequalified to bid on the maximum authorized RLB requisition of $150 million by the USACE.  Each time the U.S. military needed more building modules, the USACE would announce a new task order under IDIQ W91B4N-08-R-0021.

49.     Sterling was eventually responsible for four such task orders at the Bagram Air Base. The total value of the RLB contract was $150 million.  Under the RLB IDIQ the USACE placed task orders for specific quantities of RLBs under the umbrella IDIQ.

**2.     Sterling Submits Bid on IDIQ Despite Lack of Qualification.**

50.     Sterling had significant experience contracting with the USACE.  However, this experience was almost exclusively with disposing of unexploded ordnance and environmental remediation.

51.     In 2008, Sterling had no significant experience in large-scale military construction, and no significant experience in fabricating RLBs.

52.     The challenge for Sterling in performing on the IDIQ was that it had never fabricated RLBs for a paying counterparty.

53.     Sterling suffered from a critical shortage of personnel with significant construction skills.  Sterling had only one person, Chris Humphries, who had prior experience in large scale modular building contracts.  Though Mr. Humphries worked on the solicitation bid, he left Sterling shortly thereafter leaving no one at Sterling who had prior RLB expeditionary construction experience.

54.     Sterling intended to "learn [RLB construction] by doing."

55.     The aforementioned obstacles did not stop Sterling from making a bid on Solicitation.

56.     On information and belief, Sterling made false statements to the U.S. regarding its qualifications to perform on the IDIQ above-described.

### 3.     Sterling's Early Performance Struggles Made it Desperate to Subcontract with MAKS which had Extensive Experience in RLB Construction.

57.     Sterling's problems started with the very first task order it was issued by USACE. That task order was subcontracted to a company called Blue Star Construction Company ("BSCC").   Sterling could not manage what itself did not know how to do.

58.     Before the problems with Task Order 1 could be addressed, USACE assigned Sterling Task Order No. 2.

59.     Sterling subcontracted Task Order 2 to a company called K2 Construction Company.

60.     Sterling lacked the institutional know-how needed to manage K2.

61.     In December, 2008, a man named Doug Rogers introduced Sterling and MAKS.

62.     Doug Rogers was a former member of the U.S. Special Forces who briefly worked for MAKS as the Director of Business Development.

63.     Mr. Rogers had a personal relationship with Sterling Vice President Henry Mincke.

64.     Knowing of Sterling's immediate need for RLB module fabrication and MAKS's extensive experience in RLB module fabrication, Doug Rogers introduced the two companies, Sterling and MAKS, and it seemed like a perfect fit. Sterling had a significant need for professionally made modules.

65.     MAKS was a professional maker of modules who had already delivered tens of thousands of modules for the use by the U.S. military and U.S. defense contractors in Iraq.

66.     Sterling was so eager for MAKS to make the modules needed that it made promises to MAKS that MAKS would receive a flood of subcontracting work flowing from the IDIQ if it first agreed to take over Task Order 2 from K2 and take responsibility for a soon-to-be-bid-upon Task Order 3.

67.     MAKS agreed to contract with Sterling through Master Subcontract No. 012809.01/SF.

68.     Under Work Authorization 01 signed on February 1st, 2009, MAKS was to make 112 RLB modules in Kuwait, ship them to Afghanistan and deliver them to the Bagram Air Base.   For this work MAKS was to be paid $2.2 million in two installments: the first, an advance payment of $1.1 million, the second to be paid when the modules were installed on the Bagram Air Base.

69.     Sterling never made the final 50 percent payment due on this Work Authorization, a missing payment of $1.1 million.

70.     The second Work Authorization was signed by Sterling and MAKS just 18 days after execution of the first Work Authorization.

71.     MAKS was contracted to make an additional 112 modules for use at the Bagram air base. This work authorization was to be paid in four equal parts: the first quarter to be made in advance, the second payment was to be made upon the modules being shipped from Kuwait, the third to be made when the modules arrived in Afghanistan, and the fourth payment to be made when the modules were installed at the Bagram.

72.      Sterling was a month late in making the very first payment under Work Authorization 2, weeks late in making the second payment, and Sterling never made the final two payments on the modules under Work Authorization 2.

**4.      Sterling's USACE Contracting Conduct was Systemically Fraudulent; Early-On, Sterling Planned "Operation Midshipman" to Steal the Modules Obligated to USACE from MAKS.**

73.     Sterling never intended to honor the contract or fully pay MAKS.

74.     Though initial email communications between Sterling and MAKS offered glowing and optimistic picture of Sterling and MAKS future working relationship, even Sterling's early internal e-mail traffic reveals that Sterling did not want any long-term relationship with MAKS.

75.     Sterling felt threatened by MAKS, fearful it would enter the same IDIQ marketplace and become a competitor.

76.     Even as Sterling was negotiating with MAKS, Sterling was planning on taking advantage of it.

77.     Sterling internal e-mails reveal that Sterling intended to seize for itself the investment that MAKS was making in performing Work Authorizations 1 and 2.

78.     Knowing that it had no interest in a long-term relationship with MAKS, Sterling planned a fraudulent scheme wherein it would extract from MAKS the maximum amount of technical know-how and matériel, without itself having to make significant capital outlays.

79.     On February 2, 2009, Curtis Guilbeaux of Sterling sent an email announcing a breakthrough in negotiations with MAKS.  His email stated:

> After intense negotiations with the contracting firm MAKS Inc., I am pleased to announce that we will be adding over a quarter million dollar's [sic] to our bottom line.  In addition, MAKS will bring us one step closer to our ultimate goal of self-performance and maximization of profit. . . . By performing the project with this realm, [Sterling] realizes a number of significant benefits: [including] . . . we move one step closer to our strategic goal of self-performance through experience [and] . . . we study and learn their [MAKS's] processes, procedures, and efficiencies, and keep those under our belt until we are ready to do this on our own.

80.     The next day Mr. Guilbeaux commented on the possible subcontract with MAKS as follows:

> I think this is our preferred option.  First, it takes their dollars and invests it into our fabrication yard, increases our bottom line, gets use one step closer to our strategic goal of self-performance, and keeps a competent subcontractor in our pocket.  In addition, we study their processes and controls and keep our quality at a high level.  Most important, it gets the ball back into our court; we can say in the future, "take it or leave it.

81.     Emails and deposition testimony also reveal that, to boost its bottom line, Sterling intended to build the capacity and self-perform the remainder of the IDIQ Task Orders.   Self-performance is the opposite of an on-going and long term contractor/ subcontractor relationship that MAKS had been promised as an incentive to entering into the Master Subcontract.

82.     Sterling created false records in furtherance of its Operation Midshipman scheme. Specifically, Sterling falsely represented MAKS as an incompetent subcontractor so that it could later justify the termination of MAKS's subcontract in furtherance of Operation Midshipman.

83.     This false record was generated notwithstanding the fact that MAKS continuously did additional work that was outside the scope of the contract.

84.     No amount of additional or out-of-scope work by MAKS could have saved it from having its property seized as Sterling's management had decided upon Operation Midshipman at least as early as mid-June 2009.

85.     Operation Midshipman was initially called "Operation MidShipMan," which stood for "MAKS is done, ship modules north."

86.     Operation Midshipman was a military maneuver that was designed to seize MAKS RLB modules after those modules arrived in Afghanistan.

87.     The key to Operation Midshipman was getting Sterling security forces in close proximity to the modules, as they arrived in Afghanistan, so that Sterling could gain control of them when Sterling decided to abruptly terminate MAKS.

88.     Sterling's original plan for Operation Midshipman became more complicated when MAKS decided not to deliver its RLB modules directly to the Sterling compound.

89.     MAKS officer Jagdeep Singh opted to lease a compound separate from Sterling's – a compound where MAKS technicians could operate freely to make final adjustments to the modules prior to them being delivered to Sterling's compound.

90.     After Mr. Singh made this decision, John Jordan, Sterling's "Chief of Party" in Afghanistan, held a rare person-to-person meeting with Mr. Singh.   Mr. Jordan quizzed Mr. Singh about who MAKS was considering to provide site security at MAKS's newly acquired compound.

91.     Unsolicited, John Jordan offered Sterling's security forces to guard the MAKS compound and at a steeply discounted, if not nominal cost.

18

92.     In signing Sterling's security contract, MAKS thought it was obtaining Sterling's professional assistance in safeguarding its personnel and property.

93.     The utility of the security contract to Sterling was that it could preposition its gunmen proximate to the RLB modules until it was time to execute the Operation Midshipman raid.

94.     At the time Sterling offered its security services to MAKS, Sterling was already in the process of planning Operation Midshipman.

95.     Though Sterling officer Les Lunceford was briefed on Operation Midshipman in mid-June 2009, John Jordan, David Cook (head of Sterling security services), and Sterling Vice President for Operations Henry Mincke had already constituted a "Operation Midshipman" team.

96.     Sterling General Counsel Erik Quist signed the MAKS-Sterling security contract on June 3, 2009.

97.     Less than a month later, Sterling General Counsel Erik Quist final approval to Operation Midshipman, the plan to steal the RLB modules that Sterling had pledged to protect, from MAKS.

98.     Concurrent with General Counsel Quist's approval of Operation Midshipman, Sterling Finance Director Beamish, reporting on the profitability of completing the four task orders for which Sterling was obligated, wrote, tellingly, "This does not take into consideration any additional costs related to arranging for another subcontractor to complete the work of MAKS."

99.     Thus, beyond question, by July 2, 2009 the highest levels of Sterling's senior management had signed off on Operation Midshipman.

**5.      Despite Being in Constant and Continuous Contact with the U.S., Sterling Never Informed the U.S. of its Intention to Commit Armed Robbery and Execute a Military-Styled Invasion to Steal Property that Sterling Would Deliver to the U.S. as if Fully Paid For.**

100.    During the lead up to the execution of Operation Midshipman, Les Lunceford met twice weekly with Lt. Katherine Schultz, an Air Force Officer detailed to USACE to oversee the RLB construction project.

101.    Not two days before the Operation Midshipman invasion was executed, Susan Davis and Mr. Lunceford had a face-to-face meeting with Special Agents of the FBI.   Neither Lunceford nor Davis mentioned a single word to the FBI Agents of their planned armed invasion of MAKS's private property.

102.    Having opted to pursue the fraudulent scheme "Operation Midshipman" to deny MAKS final payment, seize its property and boost Sterling's profits by at least mid-June 2009 (the intent to confront MAKS with a "take it or leave it" proposition having been expressed by Curtis Guilbeaux before the RLB contract was even signed), essentially all claims by Sterling to USACE on how it intended to perform Contract W91B4N-08-D-0012 were false.

103.    Sterling did not tell MAKS the absolutely most important fact affecting their existing and future relationship: that Sterling did not intend to make payment on the RLB modules it was obligated to obtain for USACE – it intended to steal the RLB modules it was obligated to obtain for USACE.

104.    Had USACE been informed of the pending Operation Midshipman, it would have immediately terminated its contractual relationship with Sterling.

105.    The last of the contracted-for MAKS RLB modules arrived in Kabul Afghanistan on August 16, 2009.

106.    The implementation of Operation Midshipman – and Sterling's planned forced possession of the RLB modules – was delayed by more than two additional months by delays Sterling encountered in putting all of the component parts of Operation Midshipman into place.

107.    The delays in executing Operation Midshipman included leasing land for the erection of "Camp Echo" (the compound that would be used in the short-term to store the stolen MAKS modules and in the long-term as the staging area for Sterling to self-perform on the remaining IDIQ task orders).

108.    The delays in executing Operation Midshipman included the inability of Sterling to obtain sufficient trucks for use in the theft.

109.    The delays in executing Operation Midshipman included the need to prepare for what Les Lunceford termed the "military operation" of Operation Midshipman.

110.    The delays in executing Operation Midshipman included the need to liaise with local Afghan police forces (which, in violation of the Foreign Corrupt Practices Act, were paid off by Sterling).

111.    The delays in executing Operation Midshipman included the need for Sterling to wait for the opportune moment to invade the compound when it knew that all of MAKS's senior management would be absent from the Kabul compound.

112.    On October 23, 2009, Sterling invaded the MAKS compound at 5:30 in the morning with armed gunmen.

113.    As planned, the Afghan-national guards supplied to MAKS under the Sterling/MAKS Security Contract turned inward and pointed their assault rifles at the EODT personnel as they were jolted from their sleep.

114.     The MAKS employee inhabitants of the camp were confined to their quarters by Sterling security personnel armed with assault weapons, cut off from their supply of food and water, and ordered not to interfere with Sterling taking the RLB modules or risk being shot.

115.     After being contacted by MAKS senior management by telephone, Sterling was repeatedly ordered off MAKS's property and ordered not to take MAKS's RLB modules.

116.     Relator Kumar and Azad witnessed significant damage done to the RLB modules. Sterling used a mobile crane to yank them, without any preparation for being moved, from their foundation, drag them across the ground, hoist them over ill-equipped flatbed trucks, and drop them onto the trucks from a height of two to three feet.  Dropping the RLB modules from this height caused the modules to slam down with destructive impact.  Sterling quickly hauled the modules away without fixing any braces to keep the modules from being bounced as they were transported by the trucks.

117.     Without question, such rough handling ruined the RLB modules.

118.     Keeping the MAKS employees at bay with their automatic weapons for some six hours, Sterling personnel stole 90 WA02 modules from MAKS before the Afghan Ministry of Interior Police arrived and halted further thefts by training .50 caliber machine guns upon Sterling's personnel.

119.     Les Lunceford provided his friends and family members a blunt e-mail account of the military-style invasion he planned and executed against the unarmed Indian-national civilians living at the MAKS compound:

> [W]e were all up by 4:00AM to go do battle with our 'Indian' subcontractor . . .
> Of the 136 containers we were supposed to confiscate from the subcontractor,
> we acquired 90.  We started our day at 4:30Am and by 10:15AM, the district police
> chief and two trucks of armed policemen showed up to 'mediate' the situation.
> We had weapons and they had weapons, but no one lost their cool.  The Kabul
> Police Commissioner got involved and so did the Minister of the Interior . . . Long
> story short, NO ONE got shot or injured, but we had a 'stop work' order issued by
> the Afghan Government.

**6.      Sterling Makes Additional False Claims in an Effort to Incite Afghan and U.S. Military Action Against the Unarmed Inhabitants of the MAKS Compound.**

120.    The intervention of the national Afghan Ministry of Interior police caused

Sterling to leave without of the full complement of modules it had intended to steal.

121.    Les Lunceford traveled to the local police commissioner's headquarters, invoked

the authority of the U.S. military (which he did not have) to subtly threaten military action if the

police did not assist Sterling with the theft of the remaining 22 RLB modules.  As Lunceford

characterized it in a October 24, 2009 email to other Sterling officers:

> We will show him all our U.S. Government customs documents which clearly
> demonstrates that MAKS has government property and we are entitled to it.  We
> also can say 'in a round about way' that if [Sterling] is not allowed to acquire said
> property, then the Army will show up at the compound and take it (and they won't
> be as nice as we were).

122.    Mr. Lunceford ended his email by stating, "I really hesitate to tell anyone

(especially [Lt. Schultz] . . . about our difficult in dealing with MAKS, but it may come down to

that.  So far, we have not said a word to the folks at [Bagram Air Force Base]."

123.    Sterling made false claims to Lt. Schultz and the U.S. about the events of October

23, 2009.  Sterling did not tell Lt. Schultz about its long-planned Operation Midshipman.

Instead, Sterling false claimed that MAKS had been paid, MAKS had taken RLB modules

"hostage," and that Sterling's performance of its contractual obligations would be delayed by MAKS'S actions.

> ### 7. Sterling Lied to the U.S. in Order to Obtain Equitable Adjustments to Its Period of Performance and to Obtain $3,554,175.16 in Undue Payments and Additional Remuneration.

124.    After transporting the stolen MAKS modules to Camp Echo, Sterling hired a contractor AIA Holdings Afghanistan to attempt repairs to the modules prior to delivering the modules to the Bagram Airbase.  Sterling included the cost of the AIA Holdings Afghanistan contract into a Request for Additional Funding yet did not inform the U.S. that the contract with AIA Holdings was required to make repairs to the MAKS modules it had stolen from MAKS and the reckless manner by which the stolen modules were moved.

125.    Based on this false claim of poor workmanship and false statements regarding the causes of its contract performance, Sterling sought and obtained upward equitable adjustments to its compensation for performing on Contract W91B4N-08-D-0012 and was paid hundreds of thousands, if not millions of dollars in additional compensation from USACE").

126.    Sterling employee Susan Davis testified under oath that, after the October 23, 2009 theft and invasion, Sterling received an additional $2,754,175.16 in remuneration from equitable adjustments and additional work assigned by USACE.

127.    Sterling received an additional $800,000.00 equitable adjustment to compensate Sterling for project delays.

**COUNT I**
**Violations of the False Claims Act, Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**
**Against Sterling**

128.     The allegations in Paragraph 1-127 are incorporated in this Paragraph by reference as though fully stated herein.

129.     By virtue of the acts and omissions described above, Sterling knowingly presented, or knowingly caused to be presented, false and/or fraudulent claims for payment or approval by the U.S. Government, in violation of 31 U.S.C. § 3729(a)(1).

130.     In responding to Solicitation W91B4N-08-R-0021, Sterling, upon information and belief, submitted a proposal that misrepresented the extent of its experience in building RLBs, misrepresented its experience in fabricating RLB, and misrepresented its capability to perform task orders issued by USACE.

131.     In performing Contract W91B4N-08-D-0012, Sterling made false claims to the U.S.  Specifically, Sterling claimed to the United States that it was subcontracting with MAKS to obtain needed RLB modules when, in truth, Sterling had adopted the Operation Midshipman plan to steal RLB modules from MAKS.

132.     In performing Contract W91B4N-08-D-0012, Sterling made false claims in order to secure continued payment by the U.S. where, if the truth had been known, Sterling would have been terminated as a government contractor.  Specifically, Sterling claimed to the U.S. that it was not responsible for the delays in the delivery of RLB modules when, in truth, delivery of MAKS's RLB modules to the U.S. was delayed by Sterling leasing and furbishing Camp Echo in preparation for execution of Operation Midshipman, planning the execution of Operation Midshipman, transporting the stolen MAKS RLB modules to Camp Echo, attempting to

remediate the damage to the RLB modules caused by the reckless manner by which Sterling took the modules from the MAKS compound and transported them without adequate bracing, and Sterling having to purchase new Conex modules to replace the irreparable MAKS RLB modules.

133.     In performing Contract W91B4N-08-D-0012, Sterling made false claims to the U.S. in order to secure continued payment by the U.S. where, if the truth had been known, Sterling would have been terminated as a government contractor.  Specifically, Sterling falsely claimed to the U.S. that, regarding the events of October 23, 2009, MAKS was holding RLB modules hostage in order to extract more money from Sterling.  In fact, Sterling had stolen the modules from MAKS after refusing MAKS's repeated requests to honor the payment obligations in the Master Subcontract agreement between them.

134.     In performing Contract W91B4N-08-D-0012, Sterling made false claims to the U.S. in order to secure continued payment by the U.S. where, if the truth had been known, Sterling would have been terminated as a government contractor.  Specifically, Sterling made false claims to the U.S. when it stated. that it had paid MAKS and was entitled to possession of the modules when, in truth, Sterling had not made payment on the modules and was not entitled to possession of them.

135.     In performing Contract W91B4N-08-D-0012, Sterling made false claims to the U.S. in order to secure continued payment by the U.S. where, if the truth had been known, Sterling would have been terminated as a government contractor.  Specifically, Sterling falsely claimed that the poor condition of the MAKS RLB modules was due to faulty performance by MAKS when, in truth, the damage to the MAKS modules was inflicted by the reckless manner by which Sterling stole and transported the MAKS modules.

26

136.    By knowingly, willfully or recklessly presenting or causing others to present claims for payment/reimbursement to the U.S. for provision of RLBs where Sterling had acted illegally, and in a manner that would have caused it to be immediately terminated as a government contractor and had engaged in a pervasive pattern of lies to the U.S. to conceal its illegal conduct, Sterling has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the U.S., by causing the U.S. to pay out money it was not obligated to pay.

137.    In committing these wrongful acts, Sterling has engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims.  Had the U.S. known of the falsity as to Sterling's fraudulent and criminal conduct with respect to MAKS, the government would not have made payments to Sterling.

138.    All invoices for payment submitted by Sterling for payment under Contract W91B4N-08-D-0012 were also false claims because Sterling was ineligible to perform that contract given that its course of performance included a criminal conspiracy to commit an armed invasion of private property and to steal, at gunpoint, the materials that were sought by the U.S. through Contract W91B4N-08-D-0012.

139.    By knowingly, willfully or recklessly presenting claims for payment/reimbursement to the U.S. for services performed under Contract 2, Sterling has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the U.S., by causing the U.S. to pay out money it was not obligated to pay.

140.    In carrying out these wrongful acts, Sterling has have engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these

false claims.  Specifically, had the U.S. known of this falsity as to Sterling's performance under

Contract W91B4N-08-D-0012, it would not have paid the invoices submitted under Contract

W91B4N-08-D-0012.

141.    Damages to the U.S. include, but are not limited to, three times the full value of

all such fraudulent claims.

142.    Each invoice of Contract W91B4N-08-D-0012 is a separate false claim; and each

and every fraudulent claim is also subject to a civil fine under the False Claims Act of five

thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

**COUNT II**
**Violations of the False Claims Act, Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**
**Against Sterling**

143.    The allegations in Paragraph 1-143 are incorporated in this Paragraph by

reference as though fully stated herein.

144.    By virtue of the acts and omissions described above, Sterling agreed to make use

of, and did make use of, or cause to be made use of, false records or statements to get false or

fraudulent claims paid or approved by the U.S. Government, in violation of 31 U.S.C. §

3729(a)(1)(B).

145.    Sterling submitted, and the U.S. relied upon, many documents to support its

claims for payment and equitable adjustment to Sterling's contractual obligations.  However, the

documents and records submitted to the U.S. contained false information.  For example, Sterling

provided USACE various updates as to Sterling's anticipated period of performance.  However,

none of the documents appraising USACE of adjustments to Sterling's period of performance

28

identified the planning and logistics for Operation Midshipman as a significant source for Sterling's performance delay.

146.    In addition, Sterling repeatedly submitted periodic reports, correspondence, documents, "Requests for Equitable Adjustment" or "REA" and "Request for Additional Funding" that requested of the U.S. additional money and additional time for performance of Sterling's contract obligations.  Yet, never, in creating these documents, did Sterling reflect in these documents that it had carried out Operation Midshipman (realizing a significant cost savings in the provision of the RLB modules), costs associated with bringing the RLB modules into required specification were caused by Sterling's own misconduct, or that the purchase of new Conex modules was necessary because Sterling could not repair the damage inflicted upon the MAKS modules when they were stolen.  In addition, in documents created to justify additional the payment of additional money or the extension of Sterling's period of performance, Sterling sought reimbursement for the cost of establishing Camp Echo and the cost of its contract with AIA holdings Afghanistan.  However, the documents generated to justify these equitable adjustments never disclosed that Camp Echo had been leased primarily for the purpose of holding the stolen MAKS modules and the AIA Holdings Afghanistan contract and services were required because Sterling had so severely damaged the modules it had stolen from the MAKS compound.

147.    In addition, the periodic reports that Sterling subsequently submitted to the U.S. Government regarding its compliance with its Small Business Subcontracting Plan, the FAR and all applicable federal small business statutes, contained material false statements and certifications.  Specifically, upon information and belief, on each of these reports, which were required to be submitted on a semi-annual and annual basis, Sterling certified that the work was

being performed by the Small Business Defendant it listed in those reports.  However, Sterling

knew that the work under Contract 1 was actually being performed by Sterling itself.

148.    Further, Sterling falsely represented, or at a minimum, implied, when it submitted

its periodic reports and claims for payment, that it was in compliance with all the preconditions

for contracting with the U.S. government.  Certainly Sterling never disclosed to the U.S. that its

plan for performing Contract W91B4N-08-D-0012 included the armed invasion of private

property, the payment of bribes to local police forces, the theft of private property, and the

concealment of that private property.  By implying that it would be performing the contract using

legal means when it knew that it would be performing Contract W91B4N-08-D-0012 through

illegal and fraudulent means, Sterling violated the False Claims Act.

149.    Sterling knowingly made these false statements in order to induce the

Government to pay amounts it was not obliged to pay under Contract W91B4N-08-D-0012.

150.    Had the U.S. been aware of the material false statements and certifications, by law

it could not have paid any claims submitted pursuant to Contract W91B4N-08-D-0012.

151.    As such, the false statements and certifications that Sterling made in

correspondence, reports, REAs, and RAFs to the Government were material to the U.S.'s

decision to pay the claims that Sterling subsequently presented pursuant to Contract W91B4N-

08-D-0012.

152.    All such false records or statements were implied by Sterling or made directly to

the U.S. by Sterling to get false or fraudulent claims paid or approved by the U.S.

153.    As a direct and proximate result of Sterling's fraudulent inducement, each and

every claim presented by Sterling under Contract W91B4N-08-D-0012 is a false or fraudulent

claim within the meaning of the False Claims Act.

154.     Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

155.     Each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT III
### Violations of the False Claims Act, Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(G)
### Against Sterling

156.     The allegations in Paragraph 1-156 are incorporated in this Paragraph by reference as though fully stated herein.

157.     After submitting the initial false claim under Contract 1, Sterling continued to submit false claims to avoid the forfeiture of Sterling's contract with the U.S., and thereby, the forfeiture of the payments it received from the U.S. under Contract W91B4N-08-D-0012, thus constituting reverse false claims.

158.     The false claims were made to avoid paying back to the U.S. penalties under Sterling's contracts with the Government.

159.     Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

160.     Each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT IV
### Violations of the False Claims Act, Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(C) and Conspiracy to Commit Fraud
### Against the United States, 18 USCS § 371 Against
### Matt Kaye, Lisa Jacobson, Erik Quist, Henry Mincke, Les Lunceford, Curtis Guilbeaux,
### Kevin Beamish, John Jordan, Mark Anderson, James Osterloh, David Cook, Loren
### Hughes, Loren Hughes, George Perkins, Matt Knetchel, James Pearson,
### and Thomas Dwyer

161.     The allegations in Paragraph 1-160 are incorporated in this Paragraph by reference as though fully stated herein.

162.     Matt Kaye, Lisa Jacobson, Erik Quist, Henry Mincke, Les Lunceford, Curtis Guilbeaux, Kevin Beamish, John Jordan, Mark Anderson, James Osterloh, David Cook, Loren Hughes, Loren Hughes, George Perkins, Matt Knetchel, James Pearson, and Thomas Dwyer all were willing participants in communication about, planning for, and execution of Operation Midshipman.

163.     Through such activities, Matt Kaye, Lisa Jacobson, Erik Quist, Henry Mincke, Les Lunceford, Curtis Guilbeaux, Kevin Beamish, John Jordan, Mark Anderson, James Osterloh, David Cook, Loren Hughes, Loren Hughes, George Perkins, Matt Knetchel, James Pearson, and Thomas Dwyer reflected their agreement to defraud the U.S.  Specifically, all of the participants in Operation Midshipman knew that Operation Midshipman was a secret and should not be disclosed to the U.S.

164.     Matt Kaye is the President of Sterling.  President Kaye performed affirmative and predicate acts in furtherance of Operation Midshipman including but not limited to participating in meetings to discuss Operation Midshipman, and giving final approval to Operation Midshipman.

165.    Lisa Jacobson is the Chief Financial Officer of Sterling.  Defendant Jacobson performed affirmative and predicate acts in furtherance of Operation Midshipman including but not limited to attending meetings to discuss Operation Midshipman, participating in decision making regarding the financial impact of Operation Midshipman, approving reports to the U.S. that conspicuously failed to mention Operation Midshipman or the financial impact of Operation Midshipman, and approving REAs and RFAs that did not identify Operation Midshipman as a source of the additional costs claimed.

166.    Erik Quist is Vice President and General Counsel of Sterling.  Mr. Quist was an active and early participant in the planning of Operation Midshipman providing early "legal" approval for the scheme.  Mr. Quist was also approved of false statements that were made to the U.S., including REAs and RAFs signed by Defendant Quist that were used to secure unjustified payment on Contract W91B4N-08-D-0012.

167.    Henry Mincke is Director of Capture and Proposals at Sterling.  At the time of the execution of Operation Midshipman, Defendant Mincke was a Vice President at Sterling and had direct supervision of David Cook and Les Lunceford.  In that position, Mr. Mincke engaged in affirmative acts in furtherance of the Operation Midshipman conspiracy including but not limited to making managerial decisions with respect to the timing of Operation Midshipman and serving as the conduit of information between the Operation Midshipman team in Afghanistan and Sterling's senior management.

168.    Les Lunceford is a former employee of Sterling who was principally responsible for planning the raid known as Operation Midshipman.  For all times relevant to this complaint, Defendant Lunceford was a civilian contractor working with the U.S. military in Afghanistan. During the time he was in Afghanistan, Defendant was the principal planner and commanding

officer of Operation Midshipman.  During the time Defendant Lunceford was in Afghanistan, he communicated regularly with Henry Mincke, and communicated with Matt Kaye, Lisa Jacobson, and Erik Quist regarding the planning of Operation Midshipman, the execution of Operation Midshipman, and the deceptions carried out by Sterling in Afghanistan following the execution of Operation Midshipman.

169.    Curtis Guilbeaux is a former employee of Sterling and was one of the early participants in the plan engage in the taking of property known as Operation Midshipman.  Specifically, it was Defendant Guilbeaux who proposed a plan to place MAKS in a position of vulnerability and use that vulnerability to steal, for Sterling's benefit, the investment that MAKS was making in performing as a subcontractor to Sterling.

170.    Kevin Beamish was formerly Vice President for Finance at Sterling.  Mr. Beamish was an early planner of Operation Midshipman having provided financial analysis of the cost to Sterling of performing on Contract W91B4N-08-D-0012 once Sterling had stolen the RLB modules from MAKS.  In addition, Defendant Beamish was an active participant in the conspiracy to make false claims to the government by participating in the preparation of documents in support of equitable adjustments that were materially misleading as for the reason claimed for the equitable adjustments.

171.    John Jordan was an employee of Sterling who served as Chief of Party for the company in Afghanistan.  As Chief of Party, Defendant Jordan worked closely with Defendant Lunceford on the planning of Operation Midshipman and in the deceptions perpetrated in Afghanistan following the execution of Operation Midshipman.  It was John Jordan who gave the final order to execute Operation Midshipman.  While in Afghanistan, Defendant Jordan

played a significant role in keeping Matt Kaye, Lisa Jacobson, Henry Mincke, and Erik Quist informed of Operation Midshipman.

172.    Mark ("Andy") Anderson served in Afghanistan for Sterling as the Project Manager of the RLB program.  Defendant Anderson was one of the principle architects of Operation Midshipman and it was Defendant Anderson who led the armed invasion of the MAKS compound on October 23, 2009.  It was Defendant Anderson who instructed MAKS employees, including Relator Kumar and Relator Shabbir, not to interfere with Sterling's seizure of the RLB modules or they would be shot.

173.    James Osterloh served as a construction foreman for Sterling in Afghanistan. Defendant Osterloch was briefed into Operation Midshipman as early as July 12, 2009 and contributed to its implementation.  Specifically, Defendant Osterloch was stationed at Camp Echo and was responsible for the receipt of the stolen MAKS modules.

174.    David Cook was a principle architect of Operation Midshipman.  It was Defendant Cook who obtained approval for Operation Midshipman on or about July 2, 2009, and communicated that approval to Henry Mincke, John Jordan, Les Lunceford, and Mark Anderson. On information and belief, Defendant Cook was the one who proposed Operation Midshipman to Sterling.  It was Defendant Cook who drafted the letter for Erik Quist's signature terminating the Master Subcontract Agreement with MAKS – a fraudulent document as it had been written in anticipation of executing on Operation Midshipman.  On information and belief, Defendant Cook lives in Kingston, TN.

175.    Loren Hughes worked in Afghanistan and was a member of the Operation Midshipman team.  Defendant Hughes both trespassed upon MAKS's property and supervised

the loading of the stolen MAKS RLB modules onto trucks at the MAKS compound and the unloading of the trucks at the Sterling compound, "Camp Echo."

176.    Wayne Bryce worked in Afghanistan as the Deputy Project Manager of the Bagram RLB program.  Defendant Bryce was a member of the Operation Midshipman team. Defendant Bryce trespassed on MAKS's property on October 23, 2009 and assisted with the theft of the RLB modules.

177.    George Perkins served, in Afghanistan, as the Construction Supervisor for Sterling.  As part of the Operation Midshipman team in Afghanistan, it was Defendant Perkin's job to get Camp Echo up and running so that it could accept the stolen RLB modules that were trucked off the MAKS compound.  On October 8, 2009, Defendant Perkins urged the execution of Operation Midshipman stating, "we will most likely need to execute Midshipman to have any chance to meet our [Period of Performance]."

178.    Susan Davis worked in Afghanistan for Sterling.  Susan's responsibilities were to be dedicated to making sure that the logistics of Operation Midshipman were adequately arranged.  It was Defendant Davis who kept and maintained the Operation Midshipman file in Afghanistan, and it was Defendant Davis who monitored the repairs to the RLB modules at Camp Echo.  Defendant Davis was part of the team of Sterling employees who invaded the MAKS compound at 5:30 a.m. on October 23, 2009.

179.    Matt Knetchel worked as a personal security guard for Sterling in Afghanistan. Defendant Knetchel was part of the Operation Midshipman team and was part of the contingent that invaded the MAKS compound at 5:30 a.m. on October 23, 2009.  Defendant Knetchel was one of the armed security personnel that entered the MAKS compound.

180.    James Pearson worked as a personal security guard for Sterling in Afghanistan. Defendant Pearson was part of the Operation Midshipman team and was part of the contingent that invaded the MAKS compound at 5:30 a.m. on October 23, 2009.  Defendant Pearson was one of the armed security personnel that entered the MAKS compound.

181.    Thomas Dwyer worked for Sterling in Afghanistan as a construction manager. Defendant Dwyer was part of the Operation Midshipman team.  Defendant Dwyer was part of the armed invasion of MAKS's compound on October 23, 2009.  Defendant Dwyer assisted in the removal of the RLB modules from the MAKS compound.  Once the stolen RLB modules were transported to Camp Echo, Defendant Dwyer acted to hide evidence of Sterling's theft by removing the MAKS nameplates from the stolen RLB modules so that they could not be readily identifiable as belonging to MAKS.

### COUNT V
### Wire Fraud in Violation of 18 U.S.C. § 1343
### as to All Defendants

182.    The allegations in Paragraph 1-181 are incorporated in this Paragraph by reference as though fully stated herein.

183.    Defendants knowingly participated in the fraudulent scheme, Operation Midshipman, to steal RLB modules from MAKS and present those stolen modules to the U.S. without disclosing to the U.S. the misconduct giving rise to Sterling's possession of such modules.  Defendants all used interstate wire communications such as electronic mail and telephone communications in furtherance of the Operation Midshipman fraudulent scheme.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and the U.S., pray as follows:

A.      That this Court enter judgment against all Defendants jointly and severally in an amount equal to three times the amount of damages the U.S. has sustained;

B.      That each Defendant be held jointly and severally liable for a civil penalty not to exceed $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim it presented or caused to be presented and each false statement and record it made or caused to be made in violation of the False Claims Act;

C.      That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.      That Relators be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

E.      That Relators and the U.S. be awarded pre-judgment and post-judgment interest on all monies awarded;

F.      That Relators be granted any and all other relief set forth in the False Claims Act that was not specifically referenced above;

G.      That Relators be granted such other and any and all additional or further equitable or legal relief as may be determined by the Court to be just, equitable and proper.

Joseph A. Hennessey, Esq.
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland  20815
Telephone: (301) 351-5614
Email: Jhennessey@jahlegal.com

38

## JURY DEMAND

Relators/Plaintiffs demand a trial by jury on all facts and issues so triable.

Joseph A. Hennessey

Friday, October 16, 2015

## LCvR 7.1 DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTERESTS

I, the undersigned, counsel of record for Relator Gopalakrishna Pillai Ajeesh Kumar

Kammarayil and Relator Mohammed Azad Shabbir ("Relators"), certify that to the best of my

knowledge and belief, the Relators do not have any parent companies, subsidiaries or affiliates

that have any outstanding securities in the hands of the public.

Joseph A. Hennessey, Esq.
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland  20815
Telephone: (301) 351-5614
Email: Jhennessey@jahlegal.com